**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, Plaintiff, <br><br> v. <br><br> **LEMUEL VELILLA-REYES**, Defendant. | Crim. No. 15-410/14-556(DRD) |

**OPINION AND ORDER**

On October 12, 2016, a jury found Defendant Lemuel Velilla-Reyes guilty of two counts of mail fraud, in violation of 18 U.S.C. § 1341. *See* 14-cr-556 at Docket No. 358. The Court denied Defendant's *Motions for a Judgment of Acquittal* (Docket Nos. 34, 388, and 401) in an *Opinion and Order* (Docket No. 412) entered on June 12, 2017. Defendant now urges the Court to reconsider its ruling and dismiss the mail fraud counts (Docket No. 418). For the reasons set forth below, and recognizing both parties made persuasive arguments in what became a fascinating legal enigma, the Court **GRANTS** Defendant's motion, **RECONSIDERS** its prior ruling denying Defendant's motion, and **ORDERS** the entry of judgment of acquittal on Counts One and Two of 15-cr-410 (DRD).

**I.    RELEVANT FACTUAL BACKGROUND**[1]

Defendant's motion seeks reconsideration of the Court's denial of his Rule 29 motion. As such, the Court again recites the facts "in the light most favorable to the jury's verdict." *United States v. Santos-Soto*, 799 F.3d 49, 57 (1st Cir. 2015). Defendant Lemuel Velilla-Reyes ("Defendant") was an attorney licensed to practice in Puerto Rico. Co-defendant Wilfredo Rodriguez-Rodriguez ("Rodriguez-Rodriguez") was one of the leaders of a powerful drug trafficking organization that operated in the Bayamon area of Puerto Rico. The

---

[1] The Court included an identical section in its *Opinion and Order*. To aid the reader, the Court includes below those facts relevant to the instant motion. The complete factual background of the remaining charges adjudicated at trial is set forth in the Court's *Opinion and Order* (Docket No. 418).

1

organization operated primarily in the Virgilio Davila, Falin Torrech, and Brisas de Bayamon public housing projects. Rodriguez-Rodriguez was the leader of the organization's drug points at the Brisas de Bayamon complex. The two codefendants met when Defendant represented Rodriguez-Rodriguez in a state case for possession of a firearm. Defendant appeared in state court several times on Rodriguez-Rodriguez's behalf between 2006 and 2007.

### Defendant's Representation of "Felix Otero-Torres"

On July 14, 2011, at approximately 3:30 a.m., Puerto Rico Police Department ("PRPD") officers arrested Rodriguez-Rodriguez (hereinafter, "Fugitive") for unlawful possession of a firearm in Toa Baja, Puerto Rico. Rodriguez-Rodriguez was a fugitive who had evaded arrest for case 10-cr-251 (JAF) and, thus, informed the officers that he was "Felix Otero-Torres". Sometime later, Defendant appeared at the precinct and expressed to officers that he was there to represent the fugitive. The two men spoke briefly while the fugitive laid vomiting on a precinct bench. The fugitive was then taken to a hospital for treatment.

After the fugitive was discharged from the hospital, at around 9:30 PM, Pretrial Services Officer Kalynell Villanueva ("Villanueva") interviewed the fugitive. Defendant briefly appeared to state that he was representing the fugitive but left the room during Villanueva's interview with the fugitive. The fugitive provided November 5, 1980 as his birth date but did not provide any identification. Similarly, he did not provide a social security number, did not provide an address, did not provide any telephone contact information for himself or his family members, did not provide any work information, and did not provide any information regarding ownership of any vehicles or property. To questions from Villanueva, the fugitive answered he had lived in Puerto Rico for zero months prior to his arrest. Villanueva recommended the judge impose bail and, if the fugitive is able to post bail, impose electronic monitoring.

Later that day, Defendant represented the fugitive before a state court judge in the Bayamon courthouse for a determination of probable cause, known as a Rule 6 proceeding. Defendant stated for the record that he was representing "Felix Otero-Torres." The judge questioned the information in the pretrial

2

report, and Defendant stated that his client could not recall a specific address because he was new to the area. When the judge asked for the fugitive's social security number, Defendant interrupted and explained his client was not good with numbers and could not recall his social security number.

Defendant stipulated the presence of probable cause and the judge set bail in the amount of $24,000, and ordered the fugitive be fitted with an electronic monitoring bracelet. Defendant objected to electronic monitoring. At this point, the judge called Pretrial Officer Villanueva to the courtroom for a consult. Villanueva recounted the fugitive's vague answers to his questions, suggested the fugitive was a flight risk, and recommended electronic monitoring. However, Defendant stated that he had previously represented "Felix Otero-Torres" and there would be no problem with the fugitive appearing in court. He also stated that he could arrange for the fugitive to remain under the custody of his sister.

The judge ultimately decided against the imposition of electronic monitoring. The judge's determination on bail remained at $24,000. Defendant then called Milton Garcell ("Garcell"), a bail bondsman for Allegheny Casualty Company ("Allegheny") from whom Defendant had previously sought bonding services for his clients. Defendant directed Garcell to come outside the courthouse where an individual provided Garcell with $2,400 in cash. The individual also provided Defendant with cash.

Once the fugitive posted the requisite bail amount, Defendant negotiated the fugitive's booking time with PRPD officers present at the courthouse. Defendant intimated that his client was tired and hungry as it had been approximately twenty-four hours since the fugitive's arrest. Defendant asked Officer Nancy Mendez to allow him to bring his client to the precinct the following day so he could take the fugitive to eat. The officers agreed. Neither Defendant nor the fugitive appeared for booking the following day nor did either of them make any further appearances related to that case.

### The Mailings

On November 28, 2011, the Bayamon Superior Court issued a judgment forfeiting the bond issued in favor of the fugitive. The judgment was mailed to the Allegheny Casualty Company's agent in Puerto Rico.

On July 13, 2013, Allegheny Casualty Company mailed a check payable to the Puerto Rico Treasury Department to the offices of Allegeny's agent in Puerto Rico for the bond amount, $24,000.00. Authorities apprehended the fugitive in 2015.

## II.     STANDARD OF REVIEW FOR MOTIONS FOR RECONSIDERATION

It is well recognized that "[a] motion for reconsideration . . . certainly does not allow a party to introduce new evidence or advance new arguments that could or should have been presented to the district court prior to judgment." *Marks 3-Zet-Ernst Marks GMBH & Co. KG v. Presstek, Inc.*, 455 F.3d 7, 15-16 (1st Cir. 2006). Thus, a motion for reconsideration cannot be used as a vehicle to re-litigate matters previously adjudicated. *See Standard Quimica De Venezuela v. Cent. Hispano Int'l, Inc.*, 189 F.R.D. 202, n. 4 (D.P.R. 1999).

Motions for reconsideration are entertained by courts if they seek to correct manifest errors of law, present newly discovered evidence, or when there is an intervening change in law. *See Prescott v. Higgins*, 538 F.3d 32, 45 (1st Cir. 2008); *see also Rivera Surillo & Co. v. Falconer Glass Indus., Inc.*, 37 F.3d 25, 29 (1st Cir. 1994)(citing *F.D.I.C. Ins. Co. v. World University, Inc.*, 978 F.3d 10, 16 (1st Cir. 1992)). A motion for reconsideration is unavailable if said request simply brings forth a point of disagreement between the court and the litigant, or rehashes matters already properly analyzed and disposed of by the Court. *See e.g.*, *Waye v. First Citizen's Nat'l Bank*, 846 F. Supp. 310 (M.D. Pa. 1994).

Defendant's motion does not present newly discovered evidence, nor does it argue there has been an intervening change in the law. *See Prescott*, 537 F.3d at 45. Defendants' motion, therefore, can only be entertained by the Court if it seeks to correct a manifest error of law. *See id*.

## III.     ANALYSIS

The jury found Defendant guilty of two counts of violating 18 U.S.C. §1341. A conviction for mail fraud requires proof of three elements: "(1) a scheme to defraud based on false pretenses; (2) the defendant's knowing and willing participation in the scheme with the intent to defraud; and (3) the use of interstate mail

4

... communications in furtherance of that scheme." *United States v. Hebshie*, 549 F.3d 30, 35–36 (1st Cir. 2008)(quoting *United States v. Cheal,* 389 F.3d 35, 41 (1st Cir.2004)). After trial, Defendant moved the Court to enter a judgment of acquittal on the email fraud counts.

In adjudicating Defendant's prior Rule 29 motion, the Court considered all facts in the light most favorable to the prosecution and made all reasonable inferences in the government's favor. *United States v. Garcia-Carrasquillo*, 483 F.3d 124, 129-30 (1st Cir. 2007*); United States v. Boulerice*, 325 F.3d 75, 79 (1st Cir. 2003); *United States v. Walters*, 904, F.2d 765, 770 (1st Cir. 1990); *United States v. Serrano*, 870 F.2d 1, 5 (1st Cir. 1989).  During its inquiry, the Court "neither weigh[ed] the credibility of the witnesses nor attempt[ed] to assess whether the prosecution succeeded in eliminating every possible theory consistent with the defendant's innocence." *United States v. Muñoz-Franco*, 487 F.3d 25, 41 (1st Cir. 2007) (internal citations and quotations omitted). With the aforementioned principles in mind, Court held that, "a rational factfinder could [have concluded] that the prosecution proved all elements of the crime beyond a reasonable doubt." *See Garcia-Carrasquillo*, 483 F.3d at 129-30. Defendant now moves for reconsideration of the Court's holding.

Defendant posits the Court erred in finding the United States proved the statute's "mailing element," which requires that "the defendant both (1) *cause* the use of the mails, which includes reasonably foreseeable mailings, *and* (2) use the mails *for the purpose,* or *in furtherance,* of executing the scheme to defraud." *Hebshie*, *id.* (citing *United States v. Moss,* 591 F.2d 428, 436 (8th Cir.1979)). The government avers the Court has properly disposed of these matters and Defendant is merely attempting to relitigate these issues.

### i.    *A Closer Look at Defendant's Scheme*

To find the defendant guilty, the Court instructed the jury that it must find the scheme in evidence was "substantially as [the scheme] charged in the indictment." Docket No. 357 at page 24. After brief deliberations, the jury found the government proved beyond a reasonable doubt that the November 18, 2011 mailing of the judgment of the Bayamon Superior Court to the Allegheny Casualty Company's agent in Puerto

Rico and the July 13, 2013 mailing of a $24,000.000 check for the fugitive's bond from the Allegheny Casualty Company in the United States to the offices of Allegheny's agent in Puerto Rico were "in furtherance" of Defendant's scheme to "defraud and obtain property and deprive of property" the Allegheny Casualty Company. *See* Docket No. 358 (Jury Verdict); *see also* 15-cr-410 at Docket No. 18 (Superseding Indictment).

Defendant has argued vehemently that the indictment charged him with a scheme that was unsupported by the evidence presented at trial. The Court originally disagreed and held as follows:

> Defendant's true intention in setting the charged scheme against Allegheny Casualty Company in motion may well have been to defraud the local court system and avoid the fugitive's capture. However, Defendant's intended victims do not guide the Court's analysis. Instead, the Court need only be satisfied that a reasonable juror could find beyond a reasonable doubt that the scheme supported by the evidence is substantially as the scheme charged in the indictment. Here, the two schemes are virtually indistinguishable particularly because obtaining bail was an essential "part of the execution of the scheme as conceived by [Defendant] at the time." The Court, therefore, finds the scheme in evidence is substantially as the one charged in the indictment. Docket No. 418 at 12 (citations omitted).

Upon a meticulous review of the record, the Court finds the evidence at trial does not support the Court's prior ruling.

Criminal defendants enjoy a Constitutional right to bail in Puerto Rico state court. Pretrial Services Officer Villanueva testified that he met with the fugitive to compile his information in order to make a recommendation on bail prior to the Rule 6 hearing. After meeting with the fugitive, Villanueva concluded that his vague answers to his questions and his lack of personal information made the fugitive a risk of flight, Villanueva recommended the judge impose the monitoring requirement to avoid the fugitive's flight. Once Villanueva recommended electronic monitoring, the fugitive's escape appeared unlikely.

The judge imposed bail and adhered to Villanueva's recommendation on electronic monitoring. Defendant vehemently objected to the imposition of electronic monitoring and went to great lengths to justify his client's lack of information regarding his address and his identity. Defendant then stated that he would

have no problem ensuring the fugitive would appear for court proceedings as he had represented him before and knew the fugitive's sister. That statement prompted the judge to revisit his initial determination and do away with the condition of electronic monitoring.[2] That was Defendant's first step towards success.

Defendant then spoke to Garcell, Allegheny's bondsman, and requested his services. Garcell testified that he had been posting bond for Defendant's clients for approximately twelve (12) years prior to the evening of July 14, 2011 while working for several bonding companies. Garcell met with the fugitive who completed the bonding company with false information about his name, address, and other personal details. Defendant did not intervene while Garcell and the fugitive completed the bonding contract.[3] Defendant then urged Garcell to come outside of the courthouse. When the two men were outside, a person gave Defendant some cash and Defendant provided Garcell with $2,400, or 10% of the total bail amount of $24,000. Garcell then posted bond on the fugitive's behalf. The fugitive was almost home free.

Now came the most important moment in Defendant's scheme. Defendant approached several local police officers at the courthouse. Defendant told the officers his client was tired and hungry and asked the officers to allow Defendant to produce his client for booking on the following day. The officers agreed. Defendant never appeared for booking.

The Court concludes it erred in interpreting the facts in evidence as supporting a scheme to defraud Allegheny Casualty Company and deprive the company of $24,000. First, Defendant did not argue for a reduced bail amount. Instead, Defendant stipulated the finding of probable cause, which typically results in a lower bail amount than when defendants contest probable cause. Second, Defendant did not seek Garcell's services because Garcell worked for Allegheny, but because Defendant and Garcell had worked together to

---

[2] Although Defendant's interest in not having the fugitive subjected to electronic monitoring is obvious, the Court cannot comprehend how the judge decided against imposing electronic monitoring on a defendant that had provided no identification, no address, and no social security number.
[3] Garcell testified that he left blank an important field of the contract at the time he posted bond on the fugitive's behalf. Garcell testified that he filled that field with false information in order to complete the bonding contract and submit it to Allegheny.

7

bail out Defendant's clients in the past. There is no evidence that Defendant's decision to seek out Garcell was motivated by a desire to defraud Garcell's employer nor is there evidence that Defendant had prior knowledge that Garcell was employed by Allegheny at the time. Finally, Defendant did not benefit from the losses endured by Allegheny when the fugitive failed to appear in court. On the contrary, it was immaterial to Defendant whether Allegheny ever mailed the bail check or whether Allegheny eventually located the fugitive. The government charged Defendant from participating in a scheme from which he derived no benefit. Accordingly, the evidence presented to the jury was such that no reasonable juror could have found beyond a reasonable doubt that Defendant intended to defraud Allegheny. The evidence supported a finding of a scheme against the justice system, both local and federal, intended to ensure the fugitive left the Bayamon courthouse without an electronic monitoring bracelet and without having been booked.

### ii. *Mailings in furtherance of a scheme to defraud*

To illustrate how the Court came to reconsider its prior ruling, the Court provides a chronological accounting of the muddled precedent that governs analysis of the mailing element of the statute. In *United States v. Maze*, 414 U.S. 395 (1974), Thomas Maze stole his roommate's credit card and used it to obtain food and lodging in several motels across the United States while signing his roommate's name on each sales receipt. *Id.* at 396. These motels then mailed their invoices to the bank that issued Maze's roommate's credit card. *Id.* The indictment alleged, "respondent had devised a scheme to defraud the Louisville bank, Charles L. Meredith, and several merchants in different States by unlawfully obtaining possession of the BankAmericard issued by the Louisville bank to Meredith, and using the card to obtain goods and services." *Id.* The court, held the mailings of invoices between the motels and the bank were not in furtherance of Maze's scheme as "[Maze's] scheme reached fruition when [he] checked out of the motel, and there is no indication that the success of his scheme depended in any way on which of his victims ultimately bore the loss." *Id.* at 402. The court reasoned the mailings merely "increased the probability that respondent would be detected and apprehended." *Id.* at 403.

Fifteen years later, the Supreme Court tackled the mail fraud statute once more in *Schmuck v. United States*, 489 U.S. 705 (1989). Wayne Schmuck was a used car salesperson who purchased used cars, rolled back the odometer to reflect lower mileage, and sold the used cars to used car retailers at inflated prices due to the low mileage of the vehicles. *Id.* at 706. The mailings subject of the charges were the mailings of the title-application form by the used car retailer to the Wisconsin Department of Transportation on behalf of the retail customer in order to transfer tittle to the customer and for the customer to obtain Wisconsin license plates. *Id.* The Supreme Court held "the use of the mails need not be an essential element of the scheme." *Id.* at 710 (internal citations omitted). "It is sufficient for the mailing to be 'incident to an essential part of the scheme,' or 'a step in [the] plot.'" *Id.* at 710–11 (internal citations omitted).

In so holding, the court reasoned the resales and Schmuck's relationship with retail sellers depended on the successful passage of title among the parties and, therefore, these mailings were in furtherance of Schmuck's large-scale, continued venture during which he altered the odometer on approximately 150 cars. *Id.* at 711-12. In closing, the court instructed lower courts to ask themselves, ". . . whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time, regardless of whether the mailing later, through hindsight, may prove to have been counterproductive and return to haunt the perpetrator . . ." *Id.* at 715.

The First Circuit first interpreted *Schmuck* in *United States v. Pacheco-Ortiz*, 889 F.2d 301 (1st Cir.1989). Pacheco-Ortiz was convicted of mail fraud for his part in an insurance fraud scheme involving arson of warehouses in order to collect on the insurance payouts. *Id.* The mailings in question were: 1) a letter from independent insurance adjusters recommending insurer settle claim for insured warehouse, 2) a letter which sought documents from insured company's owner so that settlement could go further, and 3) a letter from adjuster to insurer including copy of insured company's answer to insurer's civil complaint in nature of interpleader seeking distribution of insurance monies. *Id.* at 303.

9

The *Pacheco-Ortiz* court held that it was "sufficient that the mailings are incident to defendants' efforts in furtherance of the scheme . . . [h]owever, for the mailings to be considered 'in furtherance of the scheme, **'the scheme's completion or the prevention of its detection must have depended in some way' on the mailings**." *Id.* at 305 (citing *United States v. Pietri Giraldi*, 864 F.2d 222, 224 (1st Cir. 1988) (emphasis ours). The First Circuit upheld Pacheco-Ortiz's convictions for the first two mailings, prior to the insurance payout, as they were found to be in furtherance of Pacheco-Ortiz's scheme. *Id.* at 306. The court found the third mailing, however, "in no way furthered the execution of the scheme as conceived by the principal." *Id.*

The First Circuit expanded upon its decision in *Pacheco-Ortiz* in *United States v. Pimental*, 380 F.3d 575 (1st Cir. 2004). Reversing the district court for misinterpreting the *Pacheco-Ortiz* decision, the court held "a mail fraud conviction does not require the existence of a "but-for" link between the mailing and the fraud, or its cover-up . . . so long as it is 'incident to an essential element of the fraud.'" *Id.* at 587 (quoting *Schmuck*, 489 U.S. at 710-11). The *Pimental* court analogized the facts of its case to those in *Schmuck* as both schemes were dependent upon a prolonged harmonious relationship between the victimizers and their victims. *See* 380 F.3d at 587. The court then found the mailings charged in *Pimental* complied with the statute's requirements because they were cross-mailings between insurers and insured parties that were incidental to the essential requirement of the charged scheme to pay lower worker's insurance premiums by mischaracterizing the work done by Pimental's company. *Id.* at 588.

One year later, the First Circuit tackled the mail fraud statute once more. In *United States v. Cacho-Bonilla*, 404 F.3d 84 (1st Cir. 2005), Defendants were convicted of misappropriating federal funds by creating a "dummy" corporation through which defendants swindled federal funds granted to their employer, ASPRI, a governmental nonprofit corporation servicing the elderly in Puerto Rico. The mailings in question were monthly expense reports, which ASPRI compiled, sent to the Puerto Rico grantee agency, and the grantee agency mailed to the federal Department of Health and Human Services in order to continue receiving federal

funds. *See id.* at 87. The court again held that "[i]t is enough 'for the mailing to be incident to an essential part of the scheme or a step in [the] plot.'" *Id.* at 91 (quoting *Schmuck* at 710-11).

*Cacho-Bonilla's* importance to Defendant's motion rests not upon the holding but in the distinction drawn by the Court between ongoing schemes found in *Schmuck*, *Pimental*, and *Cacho-Bonilla* variety and schemes that the court deemed "one-shot" affairs. Namely, the court noted:

> [t]he defendants' embezzlement scheme **was not a one-shot affair**. Much of the scheme—*e.g.,* the mark-ups on Center purchases—depended upon the continuation of federal funding for ASPRI. In turn, the submission (by mail) of ASPRI data to HHS's data-collection entity perpetuated the relationship that kept funds flowing to ASPRI—or so the jury could have found from the testimony of the government's witness. So viewed, the perpetuation was essential to the scheme and the mailing was incidental to that perpetuation. *Id.* at 91 (emphasis ours).

The court did not specificy how courts are to treat the two types of schemes differently.

*United States v. Hebshie*, 549 F.3d 30 (1st Cir. 2008) clarified *Schmuck*'s instruction that mailings need only be incidental to essential elements of the scheme. Hebshie was found guilty of setting fire to his business in order to collect on the insurance proceeds. Defendant challenged his mail fraud convictions for the mailing of a reservation-of-rights letter from Hebshie's insurance company to Hebshie and the mailing a letter from the insurer's attorney to Hebshie urging Hebshie to contact the insurance adjuster for the company. *See id.* at 35.

The court instructed lower courts to apply the "in furtherance requirement" broadly. *Id.* at 36 (citing *United States v. Koen*, 981 F.2d 1101, 1107 (7th Cir. 1992)). "The relevant question at all times is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time, regardless of whether the mailing later, through hindsight, may prove to have been counterproductive and return to haunt the perpetrator of the fraud." *Id.*

*United States v. Tavares*, 844 F.3d 46 (1st Cir. 2016) is the most recent decision addressing the mail fraud statute. Tavares was part of a hiring scheme in the Massachusetts Probation Department where the

defendants would hire candidates based on legislative recommendations, not merit, and would lie on forms certifying the hires were done correctly. *See id.* at 50-51.  The defendants so acted in order to receive increased funding in addition to legislative favors for the Probation Department. *Id.* Defendants were charged with mail fraud stemming from the mailing of rejection letters to candidates who were ultimately not hired as the government understood these mailings to be essential to maintaining a façade of legitimacy in the hiring process. *See id.* at 59.

The court recognized prior case law on the matter provided that the charged mailing need only be "incident to an essential part of the scheme." *Id.* (quoting *Hebshie*, 549 F.3d at 36). However, the court expanded upon prior case law and provided the following:

> First, a mailing can serve as the basis for a mail fraud conviction even if the fraud would have been successful had the mailing never occurred.
>
> Second, however, **that mailing—even if dispensable—must at least have some tendency to facilitate execution of the fraud**. *Id.* (emphasis ours).

The court, therefore, expanded upon the threshold requirement of a mailing being incidental to an essential part of the charged scheme and added an important requirement that the same mailing must have some tendency to facilitate execution of the fraud. The court then held the mailings of rejection letters did not fit this definition, as the government did not provide evidence that "the rejection letters served [the] duplicitous function" of "maintain[ing] the façade of a merit-based system". *Id.* This decision binds us today and leads us to find in Defendant's favor. We discuss below.

### iii.    Conclusion

In our prior *Opinion and Order*, the Court noted the "connection between the scheme and the mailing is unusually thin and the count[s] would better have been omitted . . . but charging decisions belong to the prosecutor." *Cacho-Bonilla*, 404 F.3d at 90. The same is true today. However, after closely revisiting the record, the Court finds that not only is the connection between the scheme and the mailings thin, it is virtually

nonexistent. Yes, Defendant's actions towards facilitating the fugitive's escape eventually gave way to the mailings of the judgment and the $24,000 bail check. However, these mailings were not in furtherance of Defendant's scheme.

The instant case presents an unprecedented application of the mail fraud statute. The government's application of the mail fraud statute to the facts of this case is ambitious. As a result, binding case law provided little guidance for how the Court was to construe the mailing element in light of the particular facts before the Court. However, after painstaking study of the case law, the Court finds Defendant's scheme analogous to that of Thomas Maze. *See Maze*, 414 U.S. 395.

The scheme in *Maze* was a one-time spree of fraudulent credit card purchases that was characterized as a fraud upon the credit card's owner, its issuing bank, and the establishments where the stolen credit card was used. Defendant's scheme was similar, as it constituted a series of dishonest acts, all in one night, geared towards the successful escape of federal fugitive Rodriguez-Rodriguez. The Supreme Court found Maze's scheme reached fruition when he checked out of the motel and, accordingly, the posterior mailings of credit card statements and invoices between the aggrieved parties were not in furtherance of Maze's scheme. *Id.* at 402.

The government relies on the line of cases, beginning with *Schmuck*, which stand for the proposition that it is sufficient for a mailing to be "incidental to an essential part of the scheme." *Hebshie*, 549 F.3d at 36; *see also Pacheco-Ortiz*, 899 F.3d at 305; *Pimental*, 380 F.3d at 587; and *Cacho-Bonilla*, 404 F.3d at 91. Under that theory, two mailings ultimately leading up to the payment of bail would be incidental to having posted bail, which was an essential part of the scheme. This interpretation is the seed of the Court's prior error.

The government's position ignores the holding in *Tavares*, 844 F.3d 46 which expanded the longstanding threshold question when analyzing mail fraud cases by adding the requirement that the mailings in some way help facilitate the scheme submitted in evidence. *See id.* at 59. The mailings here do not satisfy

this requirement, as they did not facilitate Defendant's scheme, which had been completed long before the first mailing occurred. Instead, the case at bar is one where Defendant's "scheme reached fruition when he [exited the courthouse], and there is no indication that the success of his scheme depended in any way on which of his victims ultimately bore the loss." *Maze*, 414 U.S. at 402.

Defendant's scheme reached fruition when he walked out of the Bayamon courthouse with the fugitive in tow. At that point, Defendant had no interest in the fugitive's continued freedom nor did he have an interest in who bore the loss caused by his actions. Defendant had accomplished his singular task of enabling the fugitive's flight and, while unsavory, Defendant's conduct does not violate the mail fraud statute.

Like the victims of Maze's fraud, Allegheny suffered a substantial loss, which was caused, in part, by Defendant.  That fact alone is insufficient to fit the square-pegged scheme into the circle-shaped slot indictment. Moreover, in other cases of mailings posterior to the scheme's point of fruition, mailings are generally held in furtherance of the scheme when they lull the victims into a false sense of security or delay detection of the fraud. *See, e.g., U.S. v. Fiorito*, 640 F.3d 338 (8th Cir. 2011); *U.S. v. Mooney*, 401 F.3d 940 (8th Cir. 2005); *U.S. v. Tanke*, 743 F.3d 1296 (9th Cir. 2014); *U.S. v. Redcorn*, 528 F.3d 727 (10th Cir. 2008); and *U.S. v. Washington*, 724 F. Supp. 2d 1122 (D. Kan. 2010). Accordingly, the Court finds no reasonable juror could find beyond a reasonable doubt that the two mailings charged in the indictment were in furtherance of Defendant's scheme.

### III.   CONCLUSION

The Court does not favor reconsideration of its prior rulings. Seldom does the Court find it committed a manifest error of law in a prior order. However, this case belongs in the rare group of situations where the Court must accept its prior error and reconsider the ruling made therein. As stated above, the Court erred in holding that a reasonable juror could find beyond a reasonable doubt that Defendant was guilty of defrauding Allegheny Casualty Company and depriving it of property through deceit. Instead, the Court holds the scheme

supported by the evidence was one against the justice system alone and the proof presented at trial did not reflect a scheme substantially as the one charged in the indictment.

The Court's would rule differently if the government had presented evidence of Defendant arguing for a lower bail amount or if there was evidence that Defendant bore animus towards Allegheny. The facts at trial, however, reflected a scheme that came to fruition the moment Defendant left the courthouse. The government did not present evidence that Defendant had any interest in the fugitive evading authorities after July 14, 2011.  Defendant did not benefit from the mailing of the judgment or the bail check. Those mailings served to alert the authorities that the fugitive had absconded, added Allegheny to the long list of parties desperately seeking to apprehend the fugitive, and disclosed the nature of the scheme on July 14, 2011.

The Court holds as a matter of law that no reasonable juror could have found beyond a reasonable doubt that these mailings were in furtherance of Defendant Lemuel Velilla-Reyes' scheme. The Court **GRANTS** Defendant's motion (Docket No. 418), **RECONSIDERS** its prior ruling denying Defendant's motion, and **ORDERS** the entry of judgment of acquittal on Counts One and Two of 15-cr-410 (DRD) pursuant to Rule 29. *See* Fed. R. Civ. P. 29(c)(2)("If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal").

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 17th day of July, 2017.

/s/ Daniel R. Dominguez  
DANIEL R. DOMINGUEZ  
U.S. DISTRICT JUDGE